Filed 12/27/24  P. v. Robinson CA5
Opinion following transfer from Supreme Court

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>LARRY WAYNE ROBINSON,<br><br>    Defendant and Appellant. | F082378<br><br>(Super. Ct. No. PCF397760)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Tulare County.  Nathan G. Leedy, Judge.

William Paul Melchor, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell and Kimberley A. Donohue, Assistant Attorneys General, Michael A. Canzoneri and Tia M. Coronado, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

**SEE CONCURRING OPINION**

# INTRODUCTION

This matter is before us on transfer from our Supreme Court for reconsideration in light of *People v. Lynch* (2024) 16 Cal.5th 730 (*Lynch*), which settled a division among Courts of Appeal on the appropriate standard for assessing prejudice in the context of noncompliance with the requirements of Penal Code[1] section 1170, subdivision (b)(1), (2), and (3) as modified by Senate Bill No. 567 (2021–2022 Reg. Sess.) (Senate Bill No. 567). In accordance with the direction of the Supreme Court, we vacated our earlier decision and notified the parties they may file supplemental briefing.

Based on two separate incidents in May 2020, defendant Larry Wayne Robinson was charged with two felony counts of making criminal threats against T.C.,[2] his former girlfriend (§ 422; counts 1, 3); one felony count of making a criminal threat against J.S., another woman (§ 422; count 4); two misdemeanor counts of contempt of court by violating a protective order issued pursuant to section 136.2 (§ 166, subd. (c)(1); counts 2, 5); one misdemeanor count of resisting or obstructing a peace officer (§ 148, subd. (a)(1); count 6); and one misdemeanor count of possessing drug paraphernalia (Health & Saf. Code, § 11364, subd. (a); count 7). As to counts 1, 3, and 4, the amended information alleged defendant suffered eight prior felony convictions within the meaning of section 1203, subdivision (e)(4); and suffered a prior conviction under section 422, qualifying as a prior strike offense within the meaning of the Three Strikes law (§§ 667, subds. (b)–(i), 1170.12, subds. (a)–(d)) and a prior serious felony conviction within the meaning of section 667, subdivision (a)(1). As to counts 3 and 4, the amended information also alleged defendant personally used a deadly weapon within the meaning of section 12022, subdivision (b)(1), during the incident on May 12, 2020.

---

[1] All statutory references are to the Penal Code except as otherwise noted.

[2] The record reflects that T.C.'s surname began with a "K." However, because the lower court and the parties refer to her as "T.C.," we do the same for the sake of consistency.

Following trial on these charges, a jury convicted defendant on all counts, but found not true that defendant personally used a deadly weapon as to counts 3 and 4. In a bifurcated proceeding, the trial court found defendant suffered a prior conviction for violation of section 422, qualifying as a strike. The court also determined defendant suffered seven prior felony convictions for purposes of section 1203, subdivision (e)(4).[3]

Defendant was sentenced to an aggregate determinate term of 12 years 4 months.[4] The trial court imposed the upper term of three years on count 1 (§§ 422, 1170, subd. (h)(1)), doubled to six years for the prior strike (§§ 667, subd. (e)(1), 1170.12, subd. (c)(1)). On count 3, the trial court imposed eight months (one-third of the two-year middle term), doubled to 16 months for the prior strike (§ 667, subd. (e)(1)), to be served consecutive to count 1 (§ 1170.12, subd. (a)(6)). On count 4, the court imposed the upper term of three years (§§ 422, 1170, subd. (h)(1)), doubled to six years for the prior strike (§§ 667, subd. (e)(1), 1170.12, subd. (c)(1)), to be served concurrent with count 1. The court also imposed an additional five years for the prior serious felony conviction enhancement (§ 667, subd. (a)). No time was imposed on the misdemeanor counts 2, 5, 6, and 7.[5]

---

[3] Based on the trial court's review of defendant's rap sheet, it could not determine whether the section 666 charge from 1992 was a felony or a misdemeanor, but all the other offenses appeared to the court to be felonies. The court found true beyond reasonable doubt the fact of all prior convictions, with the exception of the conviction under section 666 in Tulare County Superior Court case No. 31514.

[4] The People correctly note the abstract of judgment incorrectly reflects a total term of 11 years 4 months. However, because we vacate the sentence and remand for resentencing, we need not order the abstract amended.

[5] The current offenses were committed while defendant was on mandatory supervision after pleading no contest to a violation of section 273.6, subdivision (d) and receiving a two-year split sentence under section 1170, subdivision (h). At the sentencing hearing, defendant's mandatory supervision was terminated, and he was ordered to serve concurrently the time remaining on his previously imposed two-year sentence.

Defendant argues there was insubstantial evidence to support his conviction on count 1 for making criminal threats against T.C. on May 8, 2020.  Defendant also argues his request for a continuance due to an untimely probation report was denied, which caused the sentencing hearing to be fundamentally unfair, and resentencing is required.  Finally, the parties agree, as do we, that defendant's sentence must be vacated and the matter remanded for resentencing in light of *Lynch* because an upper term sentence was imposed, at least in part, based on an aggravating factor not proved in compliance with section 1170, subdivision (b) and the record contains no clear indication the trial court would have imposed the same sentence if it understood the new scope of its sentencing discretion.

We vacate defendant's sentence and remand for full resentencing.  In all other respects, the judgment is affirmed.

## BACKGROUND

T.C. testified defendant is her former boyfriend; they broke up about three years before trial.  According to T.C., defendant was violent and abusive; she has been trying to stay away from him but he would not leave her or her family and friends alone.  She has obtained restraining orders against him in the past, but he keeps making contact with her and her family.

Since her breakup with defendant, T.C. still "hang[s] out" with him.  T.C. admitted she is a methamphetamine addict and that she had smoked the drug the night before her trial testimony.  She often obtains the drug from defendant.  Since their breakup, T.C. has tried not to smoke the methamphetamine defendant provides, but defendant uses it as a way to be with her and control her.

T.C. and her father live in separate trailers on her father's property.  Defendant lived with T.C. for the first six months they were together, but T.C.'s father kicked defendant out one day while she was gone.  Since then, T.C.'s father had not wanted defendant on the property at all.  T.C. testified she made the mistake of helping defendant

4.

get onto the property without her father's knowledge in the past, before the restraining order against defendant was in place. On prior occasions, her father had shot at defendant with a BB gun when he caught defendant on the property.

On the evening of May 8, 2020, T.C. was in her trailer when her father called her to say there was a light in the trees. She thought her father was talking about the neighbors, not the orchard across from the property. When she walked outside, she heard defendant yelling. Defendant had done this type of thing before, threatening her and her father. He has also been in the orchard across from her father's property on prior occasions; the property is fenced, and defendant has jumped the fence in the past. On the evening of May 8, 2020, defendant was threatening her and her father. He was saying that she was "done for," meaning he was going to kill her if she was not with him. T.C. told her father to call 911 while she recorded defendant with her cell phone.

T.C.'s recording of defendant was given to responding Tulare County Sheriff's Department Deputy Sandoval, and it was played for the jury at trial. Sandoval testified he was dispatched to T.C.'s residence where he interviewed T.C. and T.C.'s father. He observed that T.C.'s father seemed more angry than scared, but T.C. appeared scared to Sandoval. Deputies conducted a search for defendant in the orchard, but could not find anyone. Sandoval recognized defendant's voice on T.C.'s recording as he had contacted defendant on prior occasions.

On May 12, 2020, T.C. went to J.S.'s residence. T.C. did not know J.S. well—they had met briefly one time when defendant was living at J.S.'s house. T.C. believed defendant had left J.S.'s house two weeks before when J.S. had kicked him out. T.C. had run into J.S. a few days before and asked J.S. if she could stop by to talk. On May 12, 2020, T.C. had just gone into J.S.'s house when defendant threw a board through a window and was beating on the front door. T.C. recognized defendant's voice when he began screaming and yelling for T.C. to come out of J.S.'s house. He was calling T.C. a whore and slut and was kicking in the door; T.C. never saw defendant with any kind of

5.

weapon during that time. T.C. was terrified because she knows what defendant is capable of doing, and she was scared for the other people in the house and that they would be injured because of her.

T.C. decided to go outside; she told defendant to calm down, to stop tearing up the house and she would come out. By the time T.C. decided to come out, defendant had already left and jumped the fence that surrounded J.S.'s residence. He was across the street screaming, yelling and threatening her life. The police arrived, T.C. pointed them in defendant's direction, and defendant ran. While the police pursued defendant, T.C. went back to her own property. She waited for officers to contact her there.

J.S.[6] testified she and defendant were related through marriage. She also knew that he and T.C. had dated in the last five years. Defendant had lived at J.S.'s residence, but she had kicked him out three months prior to the May 12, 2020 incident, when she had caught him stealing tools out of her shop. J.S. had met T.C. two or three times before, including when defendant brought T.C. to J.S.'s house while defendant was living there—J.S. testified T.C. had visited defendant about a month before the incident.[7] J.S.'s house is fenced in with a locked gate. There are cameras outside, but they project only a live feed and do not record content.

On May 12, 2020, T.C. had arrived at J.S.'s house about 12:45 p.m. J.S. went outside and opened the gate so T.C. could pull her truck into the driveway. J.S. then locked the gate and she and T.C. went inside. Immediately thereafter, defendant started banging on the door. Defendant was yelling, screaming and hitting the door with things. J.S. later found a two-by-four had been thrown through her window. Defendant was also

---

[6] The record reflects that J.S. changed her surname to begin with "M." However, because the lower court and the parties refer to her as "J.S.," we do the same for the sake of consistency.

[7] J.S.'s testimony was inconsistent about when she asked defendant to move out of her property.

trying to kick in the door and damaged it while doing so. He kept saying he was going to "kill you, you stupid bitches."

J.S. called 911; she also walked to a different part of the house where she had a view of the porch where defendant was trying to get into the residence. J.S. saw him with a knife in his hand and it looked like he was hitting the door with it. When officers arrived, defendant fled the area. T.C. left, and J.S. locked and closed the gate behind T.C.'s vehicle. When Tulare County Sheriff's Department Deputy Williams arrived later, it was dark. J.S. had misplaced the keys to the gate and could not let Williams into the yard.

Williams testified that he was dispatched to J.S.'s residence on May 12, 2020, because of an altercation involving defendant, and he was aware of defendant's restraining orders from previous contacts with defendant. When he arrived, he saw J.S. and T.C. inside the secured fenced area at J.S.'s residence, and defendant was across the street in a driveway. When Williams exited his vehicle, defendant immediately fled. Deputies pursued defendant, and he was apprehended about 10 or 15 minutes later. Defendant was searched, and deputies found drug paraphernalia in his pocket, a condom, money, and a butane lighter. No knife was found.

Williams interviewed T.C. on May 12, 2020; T.C. said she had gone to J.S.'s house and, while she was there, she heard a loud banging sound on the door and someone was trying to break into the house. T.C. recognized defendant's voice, and defendant was saying that T.C. should come outside or he would kill her and harm occupants inside the house. T.C. thought it was in her best interest to go outside so no one else would get hurt. When T.C. went outside, law enforcement had started to arrive in the area. Williams thought T.C. looked extremely upset when she was interviewed and appeared fearful. She had difficulty speaking and she was shaking.

7.

Williams also interviewed J.S. that day, and J.S. appeared angry, upset, and fearful. To Williams, J.S.'s property did not appear well kept—there were weeds and dry grass partially obscuring several vehicles parked on the property. He was unable to examine the property, however, because J.S. had misplaced her keys to the gate and could not let him onto the property. When Williams returned to J.S.'s property in October 2020 to examine damage to the front door, the property also appeared cluttered and unkempt.

Timothy Stewart testified on behalf of defendant. Stewart had known defendant for more than three years, and had known T.C. for about 13 or 14 years. J.S. lives across the street from Stewart, and Stewart had seen T.C. over at J.S.'s house to visit defendant on prior occasions. J.S. had kicked defendant out about two days before the incident. Defendant was staying in a van in Stewart's driveway, where he had stayed for about two nights. On the day of the incident, Stewart had walked to the store—he did not see anyone outside the house before he left. When he walked back, he saw T.C. at J.S.'s house. T.C. was talking loudly and saying things to defendant, and defendant was responding. Stewart told defendant not to "mess" with T.C., and started walking back to Stewart's trailer. As soon as he and defendant started walking back to the trailer, deputies arrived.

A stipulation was read to the jury that on December 17, 2019, defendant was convicted of one misdemeanor count of violating a court order to prevent domestic violence in violation of section 273.6, subdivision (a); on May 14, 2019, defendant was convicted of two misdemeanor counts of violating a court order to prevent domestic violence in violation of section 273.6, subdivision (a); and on July 1, 2019, defendant was convicted of one misdemeanor count of violating a court order to prevent domestic violence in violation of section 273.6, subdivision (a).

8.

On October 23, 2020, the jury returned a guilty verdict on all counts, but found not true the special allegation that defendant personally used a deadly or dangerous weapon as to counts 3 and 4. On January 15, 2021, defendant was sentenced to an aggregate term of 12 years 4 months. On counts 1 and 4, the trial court imposed the upper term.

On February 3, 2021, defendant filed a notice of appeal.

## DISCUSSION

### I. SUBSTANTIAL EVIDENCE SUPPORTS COUNT 1

Defendant argues there is insubstantial evidence to support his conviction for making criminal threats against T.C. on May 8, 2020, in violation of section 422 as alleged under count 1.

#### A. Standard of Review

The relevant inquiry governing a challenge to the sufficiency of the evidence " 'is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1055, italics omitted.) The reviewing court's task is to review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Bolin* (1998) 18 Cal.4th 297, 331; *People v. Johnson* (1980) 26 Cal.3d 557, 578.)

We "presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.) "A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis . . . is there sufficient substantial evidence to support" ' the jury's verdict." (*Ibid*.)

"In deciding the sufficiency of the evidence, a reviewing court resolves neither credibility issues nor evidentiary conflicts." (*People v. Young* (2005) 34 Cal.4th 1149,

9.

1181.)  "Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact.  [Citation.]  Moreover, unless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction."  (*Ibid*.)  " ' " '[A]lthough an appellate court will not uphold a judgment or verdict based upon evidence inherently improbable, testimony which merely discloses unusual circumstances does not come within that category.  [Citation.]  To warrant the rejection of the statements given by a witness who has been believed by a trial court, there must exist either a physical impossibility that they are true, or their falsity must be apparent without resorting to inferences or deductions.  [Citations.]  Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.' " ' " (*People v. Dalton* (2019) 7 Cal.5th 166, 209.)

### B.    Additional Background:  Recorded Statements on May 8, 2020

T.C. made a recording of a portion of the interaction with defendant on May 8, 2020, which was delivered to Sandoval when he was dispatched to the scene.  That recording was played for the jury, and a transcript was provided.[8]  In relevant part, the recording transcript provides as follows:

> "[Defendant]:    Kill me.  I'm waiting for the cops.  (Inaudible)
> [¶] . . . [¶]
>
> "[Defendant]:    (Inaudible) shoot me.  (Inaudible) shoot me.
>
> "[T.C.]:    No nobody's gonna be doing anything.
>
> "[Defendant]:    (Inaudible) cops.  I'm right here.  (Inaudible) shoot me—shoot me.  (Inaudible) shooting at me.  [¶] . . . [¶]

---

[8] The recording was not provided as part of the record on appeal, but the transcript the parties stipulated to provide to the jury is contained in the clerk's transcript.

10.

"[Defendant]: Fuck you, [T.C.] Fuck you. (Inaudible) you're a low life (inaudible) fat whore. Yeah your—your time's—you[r] time's done—you[r] times done.

"[T.C.]: So you're threatening my life again?

"[Defendant]: (Inaudible) your times done—your time's done. (Inaudible)

"[T.C.]: You're coming back?

"[Defendant]: (Inaudible)

"[T.C.]: You're gonna burn my house down and stuff alright—right? That's what you just said.

"[Defendant]: (Inaudible) run.

"[T.C.]: Yeah run. Run like you always do.

"[Defendant]: (Inaudible) run. I'm gonna go get me a gun.

"[T.C.]: You're gonna go get a gun?

"[Defendant]: At your house. I'm gonna shoot at your house, bitch.

"[T.C.]: You're gonna shoot at my house?

"[Defendant]: Yeah, yeah I am. You—you guys shot at me.

"[T.C.]: Because you're over here on the fucken property and shit.

"[Defendant]: I didn't (inaudible).

"[T.C.]: You're fucken here fucken tormenting me.

"[Defendant]: No I'm not. Your dad is shooting at me. (Inaudible)

"[T.C.]: Because you're over here and you're not even supposed to be over here. You need to leave me alone. You've been tormenting me. Throwing shit at me now?

"[Defendant]: Shoot me—shoot me. Bitch, shoot me—shoot me. [¶] . . . [¶]

"[Defendant]: You're dead.

11.

| | |
|---|---|
| "[T.C.]: | Oh I'm dead? |
| "[Defendant]: | You're dead. |
| "[T.C.]: | Oh I'm dead? |
| "[Defendant]: | Yeah—yeah you shot at me. Well hey I'll wait for the cops. (Inaudible)— |
| "[T.C.]: | Good wait for 'em. I'm waiting for 'em too. |
| "[Defendant]: | Hey no—no you shot at me. (Inaudible). [T.C.], you're a low life (inaudible). |
| "[T.C.]: | Oh I'm a lowlife? I'm not the one that's tormenting you. I'm not the one that's harassing you. |
| "[Defendant]: | (Inaudible). You're a low life cunt—you're a low life (inaudible). |
| "[T.C.]: | Well you know what? I'm a low life cunt that's fine. Why don't you leave me the fuck alone? |
| "[Defendant]: | (Inaudible) low life. (Inaudible) [¶] . . . [¶] |
| "[Defendant]: | (Inaudible) you got. Bitch, I'm (inaudible) everything you got. I'll be back, bitch." |

**C.    Analysis**

To prove a violation of section 422 for making a criminal threat, the prosecution must establish (1) the defendant "willfully threaten[ed] to commit a crime which will result in death or great bodily injury to another person"; (2) the defendant made the threat "with the specific intent that the statement . . . is to be taken as a threat, even if there is no intent of actually carrying it out"; (3) the threat, which may be "made verbally, in writing, or by means of an electronic communication device," was "on its face and under the circumstances in which it [was] made . . . so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat"; (4) the threat actually caused the person threatened "to be in sustained fear for his or her own safety or for his or her immediate family's

12.

safety"; and (5) the threatened person's fear was "reasonabl[e]" under the circumstances. (§ 422, subd. (a); accord, *People v. Toledo* (2001) 26 Cal.4th 221, 227–228.)

### 1. *Specific Intent Statement Be Taken as a Threat*

As to count 1, defendant argues there is insufficient evidence, in light of the surrounding circumstances, to establish he intended for T.C. to perceive his words as a threat on the night of May 8, 2020. The People dispute defendant is entitled to any relief on this claim.

To determine a defendant's intent that words be taken as a threat, a jury examines the words used and all the surrounding circumstances. (*People v. Butler* (2000) 85 Cal.App.4th 745, 754.) There is very little ambiguity that defendant threatened to kill T.C. multiple times in his statements to her on May 8, 2020. When T.C. questioned whether defendant was "threatening [her] life again," defendant responded by saying, "[Y]our time[']s done[. Y]our time's done." Defendant also told her he was going to get a gun, and that he was "gonna shoot at your house, bitch." He told T.C. twice that she was "dead." Before he left, he told T.C. he would "be back, bitch," and the added expletive emphasized the menacing nature of his promised return.

The parties' history is one of the relevant surrounding circumstances a jury may consider to determine intent. (*People v. Mendoza* (1997) 59 Cal.App.4th 1333, 1340.) Setting defendant's words in the context of his history with T.C., there was substantial evidence for the jury to determine the statements were meant to be taken as a threat. From T.C.'s testimony, the jury could infer defendant had long been using threats and intimidation to control T.C. T.C. testified that before the incident on May 8, 2020, she had obtained a restraining order against defendant because he had continued to threaten and abuse her.

Despite the restraining order, T.C. testified defendant would show up at her residence with regularity. On one occasion he hid underneath her trailer and when she came out, he forced her back into the trailer and refused to allow her to leave or visit her

13.

children.  Defendant was constantly "shoving" methamphetamine at her, telling her to smoke it with him—he would not leave her alone.  If she tried to obtain the drug from different sources, defendant would make it impossible.  T.C. also testified defendant was violent and controlling.  Sometimes, despite the restraining order, she would "give in" and "hang out" with defendant because that was easier than putting her father or anyone else through more stress.  In this context, there was substantial evidence for the jury to infer defendant's conduct toward T.C. in their relationship was hostile, controlling, and physically abusive.  The jury could reasonably evaluate defendant's threats on May 8, 2020, in the context of their relationship history and infer defendant intended that T.C. perceive his statements as threats so that she would comply with his wishes and not interfere with what he wanted—including showing up at her property in violation of a restraining order and harassing her.

Moreover, after threatening to shoot at her house, telling her he was going to get a gun and that she was dead, defendant told T.C. he would be back.  Defendant argues his conduct in running away from T.C.'s property, as T.C. herself said on the recording he always does, demonstrates he did not specifically intend any of his statements to T.C. to be interpreted as threats.  However, the jury could reasonably conclude defendant ran away because T.C. told him she had called the police.  Further, four days later, there was evidence defendant tried to beat down the door of J.S.'s home while T.C. was there, threatening again to kill T.C. and everyone in the residence.  (*People v. Solis* (2001) 90 Cal.App.4th 1002, 1013 [the defendant's subsequent conduct is evidence a jury may consider to determine whether words were meant to be taken as a threat].)

There was ample evidence for the jury to reasonably infer T.C.'s relationship with defendant was hostile:  T.C. testified he was violent and abusive, and she had obtained a restraining order that he had violated many times.  The names defendant called her at the time he made his threats, the history of their relationship, and his subsequent conduct four days later beating in a door and threatening to kill T.C. again, and everyone in the

14.

residence, was substantial evidence the jury could reasonably rely on to conclude defendant intended for T.C. to perceive his words to her on May 8, 2020, as threats.

### 2. Unequivocal, Unconditional, Immediate, and Specific Nature of Threats

Defendant argues there was insufficient evidence his statements on May 8, 2020, were " 'so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat.' " (*People v. Toledo*, *supra*, 26 Cal.4th at p. 228.)  Defendant notes his exchange with T.C. on the May 8, 2020 voice recording shows he was reacting to being shot at by T.C.'s father, and in this context his statements were emotional outbursts, not criminal threats. Moreover, defendant points out, he ultimately fled (consistent with his past conduct) rather than carry out any threats against T.C., and he argues T.C.'s responses reflected no sense of foreboding:  she seemed to be taunting defendant.

While defendant's argument may be one way to interpret the evidence, it does not undercut the substantial evidence supporting an interpretation of the evidence favorable to the verdict.  (*People v. Collins* (2021) 65 Cal.App.5th 333, 344 [substantial evidence standard requires resolving conflicting inferences in favor of the jury's verdict].)  When considering all the relevant surrounding circumstances including the parties' relationship history, there was substantial evidence for the jury to conclude defendant's threats on May 8, 2020, were so unequivocal, unconditional, immediate, and specific as to convey to T.C. a gravity of purpose and an immediate prospect of execution of the threat. (*People v. Mendoza*, *supra*, 59 Cal.App.4th at p. 1340.)

As noted above, T.C. testified that defendant had threatened and abused her in the past, and that he was generally abusive and violent.  He would frequently come onto her father's property, hiding under her trailer; on one occasion, defendant hid under her trailer, forced her back into the trailer when she came out, and precluded her from leaving and seeing her children; and he would not leave her family or friends alone until he got

T.C. "back around." T.C. testified that when she has been around defendant, it was only because he would not leave her alone and it was easier than putting her father through more stress. Both T.C. and her father had called 911 in the past because defendant had kept up his threats and harassing behavior, and T.C. had obtained multiple restraining orders prior to the May 8, 2020 incident, which defendant had repeatedly violated.

In light of this testimony, the jury could reasonably conclude defendant was abusive and violent toward T.C.; he did not abide by an existing restraining order; he knew where T.C. lived; he knew how to obtain access to the property; and he had ambushed her in her trailer in the past. From this evidence, the jury could reasonably conclude T.C. would have been aware that defendant's flight after making his threats against her on May 8, 2020, did not diminish the likelihood of his returning at any time to carry them out—perhaps when T.C. was more isolated, less prepared, and less forewarned. Indeed, there was evidence defendant tried to beat down J.S.'s door four days later trying to get to T.C., while threatening to kill her and J.S.—a fact the jury found true by virtue of the guilty verdicts the jury rendered on the other criminal threat counts. The history of their relationship and defendant's subsequent conduct was substantial evidence from which the jury could conclude defendant's threats on May 8, 2020, to kill T.C. sufficiently conveyed a gravity of purpose and an immediate prospect of execution. (See *People v. Garrett* (1994) 30 Cal.App.4th 962, 965, 967 [the defendant's threat to put bullet in wife's head conveyed gravity of purpose and immediate prospect of execution because of the defendant's past beatings, wife's knowledge he kept a gun, and wife's knowledge he had been convicted of voluntary manslaughter in the past].)

As for defendant's assertion that T.C. seemed to be taunting defendant during the recorded portion of the incident, T.C.'s comments reasonably could have been interpreted by the jury as T.C.'s efforts to ensure that defendant's statements were memorialized and made clear on the recording. She testified she made the recording because she was trying

16.

to prove what he was doing to her. The jury also could have reasonably viewed T.C.'s comments as her effort to establish through the recording just how extreme and ongoing defendant's threats were, especially if she stood up for herself and told him to go away. That approach perhaps carried a heightened risk to T.C., but it does not necessarily indicate T.C. was unafraid or that the threats lacked a gravity of purpose and an immediate prospect of execution.

Finally, defendant argues his statements were merely emotional outbursts exhibiting his usual intemperance. There was substantial evidence defendant was abusive and violent, refused to abide by a restraining order, and T.C. and her father had called 911 in the past due to defendant's harassment and behavior. Moreover, four days after the May 8, 2020 incident, defendant again threatened to kill T.C. while trying to beat down J.S.'s door to get to T.C. It was reasonable for the jury to infer and conclude from this evidence, especially given the similarity of the threats four days later and evidence that defendant made forceful attempts to get into J.S.'s house, that defendant's threats on May 8, 2020, were not merely emotional outbursts or ranting, but statements meant as threats. (See *People v. Martinez* (1997) 53 Cal.App.4th 1212, 1221 ["[The d]efendant's activities after the threat give meaning to the words and imply that he meant serious business when he made the threat."].)

In total, there was substantial evidence to support the jury's guilty verdict on count 1.

## II. TRIAL COURT'S REFUSAL TO GRANT CONTINUANCE AT SENTENCING HEARING

Defendant argues his sentencing was fundamentally unfair because the trial court did not grant his request for a continuance based on an untimely probation report—defendant maintains his counsel did not receive the probation report until the day of sentencing.

17.

## A.    Background

At the outset of the sentencing hearing, the trial court asked whether there was any legal cause why judgment should not be pronounced.  Defense counsel indicated defendant had a motion pending before the court under *Romero*[9] and another under section 17 to reduce defendant's felony convictions to misdemeanors, but beyond a decision on those motions, counsel expressly maintained there was no legal cause that judgment could not be pronounced.

The court then explained its reasons for denying defendant's *Romero* motion and refusing to sentence the felony convictions as misdemeanors under section 17.  After the court's rulings, defense counsel inquired whether the court was going to adopt probation's recommendation as to the sentence.  When the court indicated its plan to do so, the following exchange occurred:

> "[DEFENSE COUNSEL]:  I would ask in that case to give defense an opportunity to submit a motion requesting less time for a mitigation [*sic*] sentencing.
>
> "THE COURT:  I'm gonna proceed with the sentencing now.  We've already continued it.  You've submitted a number of arguments and papers on his behalf.
>
> "[DEFENSE COUNSEL]:  In response to that, we continued it last time because we also didn't have a probation report in time.  Defense and prosecution just received the probation report this morning.
>
> "THE COURT:  If you want more time to address the factors in aggravation and mitigation, I'll hear from you further, but I'm not inclined to continue it out to file anything else.  This report was filed on the 8th— [¶] . . . [¶]
>
> "[DEFENSE COUNSEL]:  That might be.  It was not in eCourts, and I understand that that's not the way—it was only uploaded to eCourts after the fact of sentencing.

---

[9] *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497.

"So in that case, I think that some of the mitigating factors to this crime are the fact that . . . ."

**B.     Analysis**

The parties dispute the basis for the requested continuance and whether the court's denial resulted in prejudicial fundamental unfairness in the sentencing. The People maintain the request to continue the sentencing was not predicated on an untimely provided probation report, it was to allow defense counsel time to file a statement in mitigation. The People assert the trial court did not abuse its discretion to deny that request because a statement in mitigation is due four days before the sentencing hearing, and it is not dependent on receipt of the probation report—especially since the probation report was not required to be available until two days before the sentencing hearing. Any request to continue based on an untimely probation report was not made and, thus, any error asserted on this basis was not preserved for appeal.

Defendant argues the colloquy between the court and defense counsel reflects the motion to continue was definitively based on the untimely receipt of the probation report, and the inability to prepare for sentencing rendered the hearing fundamentally unfair. Moreover, the statement in mitigation would surely have addressed any aggravating or mitigating factors identified in the probation report. Regardless that the probation report was not mandatorily provided under section 1203, the court's failure to allow a continuance for further preparation around the probation report rendered the sentencing fundamentally unfair.

Continuances in criminal cases may be granted only for good cause. (§ 1050, subd. (e).) The party challenging a ruling on a continuance bears the burden of establishing an abuse of discretion. (*People v. Beames* (2007) 40 Cal.4th 907, 920.) "Under this state law standard, discretion is abused only when the court exceeds the bounds of reason, all circumstances being considered." (*Ibid.*) "A reviewing court considers the circumstances of each case and the reasons presented for the request to

determine whether a trial court's denial of a continuance was so arbitrary as to deny due process." (*People v. Doolin* (2009) 45 Cal.4th 390, 450.) A trial court may not exercise its discretion over continuances in a manner that deprives defendants or their attorneys a reasonable opportunity to prepare. (*Ibid.*; see *People v. Snow* (2003) 30 Cal.4th 43, 70.) "Although a defendant is not entitled to the same procedural safeguards at a sentencing hearing as he is at trial, the procedures must be fundamentally fair." (*People v. Leffel* (1987) 196 Cal.App.3d 1310, 1318 (*Leffel*), overruled on another ground in *People v. Bullock* (1994) 26 Cal.App.4th 985, 987–989.)

Not every denial of a request for a continuance constitutes a due process violation, "even if the party seeking the continuance thereby fails to offer evidence." (*People v. Beames*, *supra*, 40 Cal.4th at p. 921.) "Although 'a myopic insistence upon expeditiousness in the face of a justifiable request for delay can render the right to defend with counsel an empty formality[,] . . . [t]here are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process.' [Citation.] Instead, '[t]he answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied.' " (*Ibid.*) "Absent a showing of an abuse of discretion and prejudice, the trial court's denial does not warrant reversal." (*People v. Doolin*, *supra*, 45 Cal.4th at p. 450.)

When, as here, the court has requested a probation report pursuant to section 1203.10, a copy of that report must be "made available" to the court, the prosecution, and the defendant or his or her attorney, at least two days prior to the time for the sentencing hearing. (§ 1203d.)[10] Here, the record does not affirmatively establish

---

[10] As defendant was ineligible for probation given his prior strike conviction (§ 667, subd. (c)(2)), the probation report was not prepared pursuant to section 1203, subdivision (b)(1), which provides that if a person is convicted of a felony and is eligible for probation, the court shall immediately refer the matter to a probation officer to investigate and prepare a report.

when the probation report was "made available" to counsel. The probation report is stamped "RECEIVED" by the superior court on January 8, 2021, seven days before the January 15, 2021 sentencing hearing. When defense counsel noted she had not received the probation report until the morning of sentencing, the trial court pointed out the report had been received the week prior to the sentencing. Counsel asserted the report was not located in eCourts, but then appeared to concede that it would not appear in that software until the fact of sentencing hearing in any event. There was no further discussion between the court and counsel whether the probation report, despite that counsel had not received it until the day of sentencing, was nonetheless *available* to counsel at or near the time it was received by the court.

This is distinguishable from the facts in *Leffel*. There, defense counsel requested a continuance of the sentencing hearing on the ground he had not received the probation report required pursuant to section 1203 until the day prior to sentencing; while counsel had checked with the court clerk's office at 11:00 a.m. two days prior to sentencing, the report was not yet available at that time. (*Leffel*, *supra*, 196 Cal.App.3d at pp. 1314–1315.) The record in that case made clear the report was untimely because not only was counsel not in actual receipt of it until the day before the hearing, it was not *available* to counsel at the clerk's office in the required statutory time period. In the instant case, the record does not clearly establish the probation report was unavailable to counsel two days prior to the sentencing hearing as required under section 1203d.

Nevertheless, even assuming the probation report was not made available to counsel until the day of sentencing, under the circumstances presented here we are unable to conclude the trial court abused its discretion in denying the motion for a continuance. At the outset of the hearing, the trial court asked whether there was any legal cause not to proceed with sentencing, and defense counsel affirmatively represented there was no legal cause *not* to proceed. Later in the hearing, after defendant's *Romero* and section 17 motions were denied, defense counsel requested a continuance to file "a motion

21.

requesting less time for a mitigation sentencing." As the People note, a statement in mitigation was to be filed "[a]t least four days prior to the time set for imposition of judgment." (§ 1170, subd. (b)(4).) The ability to file a statement in mitigation is not dependent on receipt of the probation report which, in this case, was not required to be filed until two days before the sentencing hearing. (§§ 1170, subd. (b)(4), 1203d.) As counsel did not articulate why that statement could not have been timely filed, especially since defendant filed motions prior to sentencing under *Romero* and section 17, we cannot find the trial court abused its discretion in denying the motion on that ground.

Even to the extent defense counsel was seeking more time to review the probation report to address the aggravating factors noted therein, the court specifically told counsel it would hear from her further on her request for a continuance if she needed more time to address factors in mitigation and aggravation. Defense counsel did not respond to that invitation, and instead began to address factors in mitigation and aggravation. In sum, there is no affirmative evidence the probation report was not available to counsel in the time required under section 1203d; counsel did not raise any concerns about an untimely probation report at the outset of the hearing; counsel did not respond to the court's invitation to explain whether the continuance later sought was needed to adequately address aggravating circumstances articulated in the probation report; and counsel never indicated she was not prepared to go forward with the sentencing hearing without further review of the probation report. On this record, we are unable to conclude the probation report was unavailable to counsel at least two days prior to the sentencing hearing as required under section 1203d, or that the court's denial of the motion to continue the sentencing hearing under these circumstances rendered the sentencing fundamentally unfair.[11]

---

[11] The People maintain there can be no fundamental unfairness caused by a court refusing to continue a sentencing hearing based on an untimely probation report if the probation report was not mandatory but merely discretionarily requested by the

22.

## III. SENATE BILL NO. 567

From March 30, 2007, through December 31, 2021, California's determinate sentencing law specified that "[w]hen a judgment of imprisonment [wa]s to be imposed and the statute specifie[d] three possible terms, the choice of the appropriate term . . . rest[ed] within the sound discretion of the court." (§ 1170, former subd. (b).) In January 2021, applying the law as it existed, the trial court found true at least five aggravating circumstances and no circumstances in mitigation, and imposed the upper term on counts 1 and 4.

Effective January 1, 2022, Senate Bill No. 567 amended section 1170, subdivision (b). (Stats. 2021, ch. 731, § 1.3.) Section 1170, subdivision (b)(2) now provides, "[t]he court may impose a sentence exceeding the middle term only when there are circumstances in aggravation of the crime that justify the imposition of a term of imprisonment exceeding the middle term and the facts underlying those circumstances have been stipulated to by the defendant or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial." As an exception to the general rule, the court may consider the fact of the defendant's prior convictions based on a certified record of conviction without it having been stipulated to by the defendant or found true beyond a reasonable doubt at trial by a jury or the judge in a court trial. (§ 1170, subd. (b)(3); see *Erlinger v. United States* (2024) 602 U.S. 821, 838 ["[A] judge may 'do no more, consistent with the Sixth Amendment, than determine what crime, with what elements, the defendant was convicted of.' "].)

court. However, if the sentencing court relies on a probation report in formulating the judgment—whether or not the probation report was mandatory or discretionarily requested by the court—and that probation report was not made available to counsel timely as required under state law, such an error could cause a sentencing hearing to be fundamentally unfair if a request to continue on that basis was made and prejudicially rejected. (See *People v. Doolin, supra*, 45 Cal.4th at p. 450 [trial court may not exercise its discretion over continuances in a manner that deprives defendants or their attorneys a reasonable opportunity to prepare].)

The parties agree, as do we, that the trial court's imposition of the upper term did not meet the requirements of section 1170, subdivision (b), because not all of the circumstances in aggravation were proved in compliance with section 1170, subdivision (b),[12] and the record does not provide a clear indication that the trial court would have exercised its discretion to impose the upper term in light of the alteration of the trial court's sentencing discretion—to wit, the presumptive middle term—resulting from Senate Bill No. 567. (*Lynch*, *supra*, 16 Cal.5th at pp. 771, 773.)

## A.     Background

The first amended information alleged that defendant had suffered eight prior felony convictions, including one prior conviction which qualified as a prior strike conviction and a prior serious felony conviction. Specifically, it alleged he was convicted of a 1992 conviction for petty theft with prior convictions for the same (§ 666); a 1995 conviction for evading a peace officer in a vehicle with willful or wanton disregard for the safety of person or property (Veh. Code, § 2800.2); two 1997 convictions for battery of emergency personnel causing injury (§ 243, subd. (c)); a 1997 conviction for exhibiting a deadly weapon to resist arrest (§ 417.8); a 2002 conviction for grand theft (§ 487, subd. (a)); a 2010 strike conviction for making criminal threats (§ 422); and a 2019 conviction for violation of a protective order (§ 273.6, subd. (a)).

On October 23, 2020, at a bifurcated proceeding outside the presence of the jury, the trial court determined the truth of the seven prior felony conviction allegations. Admitted into evidence for that purpose were (1) a certified rap sheet of defendant's

---

[12] Throughout our discussion, we refer to section 1170, subdivision (b) "error." However, we note that at the time the trial court sentenced defendant, it correctly applied the then-existing law. Accordingly, while we refer to section 1170, subdivision (b) "error," we are mindful that the trial court complied with the applicable law at the time of sentencing.

criminal record[13] and (2) a certified record of conviction from the Tulare County Superior Court case regarding defendant's 2010 strike conviction for making criminal threats. The trial court further took judicial notice of its own records in a Tulare County Superior Court case regarding defendant's 2019 conviction for violation of a protective order. The court found as follows:

> "The Court finds that it has been proven beyond a reasonable doubt that the defendant . . . has suffered a conviction for a felony violation of Penal Code Section 422 in Case [No.] [V]CF229191 . . . . Based on my review of the RAP sheet, I could not determine whether the [section] 666 charge from 1992 was a felony or a misdemeanor, but all the other alleged offenses under [section] 1203 appear to be felonies. . . . I've taken judicial notice of the file in Case [No.] 385431 and find that [defendant] suffered a conviction for the felony violation of Penal Code Section 273.6[, subdivision ](a) . . . .
>
> "So in short, all the special allegations regarding prior convictions[,] with the caveat that the [court could not determine whether the section] 666 allegation in Case 31514[] [is a misdemeanor or felony,]. . . are found true beyond a reasonable doubt."

At the sentencing hearing, on January 15, 2021, defendant's counsel argued that mitigating circumstances existed that weighed against imposing the upper term and addressed the aggravating circumstances identified in the probation officer's report:

> "[T.C.] has admitted on the stand that she often does invite [defendant] over; that they do have a on-again, off-again relationship.
>
> "As to the facts relating to [defendant], he admits to probation that he has a history of alcohol and substance abuse and does wish to engage in some sort of rehabilitation program as far as that goes.
>
> "Aggravating factors; I understand that the probation report indicates that some of the aggravating factors are some of the very same things that this court has mentioned regarding the adult – the numerous adult

---

[13] For each offense of conviction, the rap sheet identified the sentence and, if applicable, defendant's grants of probation, jail sentences and reinstatements of probation after violations of probation, and violations of parole.

convictions.  [¶]  Defense goes back to the fact that no serious or violent felonies have occurred since the 2010 strike."

After defendant's argument, the trial court addressed the two purported mitigating factors relied upon by defendant, and found true at least five aggravating circumstances and no mitigating circumstances, as recommended by the probation officer's report:

"I think in many circumstances the factors that [defense counsel] has pointed out would, indeed, weigh in mitigation in my view, specifically a drug problem can certainly mitigate a situation in certain circumstances, and I am mindful that relationships are complicated and that it's not always simply a one-way street.

"In this case, under these circumstances, I just can't give significant weight in mitigation to those factors based on the length of the history with [defendant] here.

"The drug issue has clearly been going on for quite some time.  I see a drug conviction as early as 1995, and there are plenty of people with drug abuse problems that while they can struggle mightily with using controlled substances and their lives can get out of control in many ways, they don't go on to repeatedly harm other individuals, and unfortunately, that's just what I see here with [defendant].

"As to the involvement that [T.C.] had in making contact with [defendant], I don't have any doubt that there was some of that going on here, but [defendant] had been through the court system so many times with violations, and it was – or should have been so clear to him that no matter what [T.C.]'s behavior was, he was not allowed to have any contact with her for very good reason; that – I don't weigh that in mitigation, either.

"I adopt the findings of aggravation – in aggravation listed by probation.

"[1] [Defendant] was convicted of other crimes for which consecutive sentences could have been imposed but for which a concurrent sentence will be imposed.

"[2] I find that he has engaged in violent conduct which indicates a serious danger to society.  There are many times when criminal threats cases are obviously just words, and so I am always aware of taking a close look – the importance of taking a close look to see whether there are good reasons to take someone's word seriously, and [defendant] has not just

26.

made threats in these cases and previously, but he has acted out conduct that gives me reason to believe that there is a reason to believe him when he says he might do things like this. [¶] So I find that he does pose a danger, his age notwithstanding.

"[3] His prior convictions are numerous.

"[4] He was on mandatory supervision and summary probation when the current offenses were committed.

"[5] His prior performance on probation, parole and mandatory supervision have all been unsatisfactory."

Beyond the aggravating circumstances identified by the probation officer, and before pronouncing the sentence, the trial court further commented: "[6] There are crimes of violence on more than one occasion; threats of violence on more than one occasion in this case."[14]

On that record, the trial court concluded that "the factors in aggravation here decidedly outweigh any factors in mitigation." It then imposed the upper term on counts 1 and 4, setting the term on count 4 to run concurrent with the term on count 1, and imposed a consecutive one-third middle term on count 3.

---

[14] That defendant has committed multiple crimes of violence is not an aggravating circumstance specifically identified by California Rules of Court, rule 4.421 (further references to a rule or rules refer to the California Rules of Court). The trial court's comment may have simply been a further justification for its second aggravating circumstance finding, it may have been an explanation of the first aggravating circumstance finding (see rule 4.425(a)(2) [whether "crimes involved two separate acts of violence or threats of violence" impacts a trial court's sentencing choice for concurrent versus consecutive sentencing]), or it may have been a separate circumstance that the trial court believed "reasonably relate[d]" to the "circumstances under which the crime was committed" such that it was appropriately considered under rule 4.421(c). Because it is not clear to us, in an abundance of caution, we treat the trial court's statement as an articulation of a sixth aggravating circumstance.

**B. Compliance with Section 1170, Subdivision (b), as Modified by Senate Bill No. 567**

Our first consideration is whether the aggravating circumstances relied upon by the trial court were proved in compliance with section 1170, subdivision (b)(2) or (b)(3).

As to the first aggravating circumstance—that defendant was convicted of other crimes for which consecutive sentences could have been imposed but for which a concurrent sentence will be imposed (rule 4.421(a)(7))—the sentence on count 4 was designated to run concurrently to the sentence imposed on count 1, so we first review the operative information and the jury's verdicts. Count 1 alleged that defendant committed the crime of criminal threats, naming T.C. as the victim, on or about May 8, 2020; count 4 alleged that defendant committed the same offense, naming J.S. as the victim, on or about May 12, 2020. The verdict forms reflect the separate victims for counts 1 and 4, and refer to the specific counts of the information.

Section 669, subdivision (a) directs that "[w]hen a person is convicted of two or more crimes . . . the second or other subsequent judgment upon which sentence is ordered to be executed shall direct whether the terms of imprisonment or any of them to which he or she is sentenced shall run concurrently or consecutively." (See § 1170.1, subd. (a).) Section 669 "grants the trial court broad discretion to impose consecutive sentences when a person is convicted of two or more crimes." (*People v. Shaw* (2004) 122 Cal.App.4th 453, 458.) Rule 4.425 sets out the considerations for making the discretionary choice between concurrent and consecutive sentencing, including whether "(1) [t]he crimes and their objectives were predominantly independent of each other"; "(2) [t]he crimes involved separate acts of violence or threats of violence"; and "(3) [t]he crimes were committed at different times or separate places, rather than being committed so closely in time and place as to indicate a single period of aberrant behavior." The jury's verdict necessarily decided beyond a reasonable doubt that counts 1 and 4 involved separate threats of violence and were committed at different times. Based on those factual

predicates, the trial court had the discretion to impose the sentence on count 4 consecutive to the sentence on count 1 but elected not to do so. The first aggravating circumstance was proved in compliance with section 1170, subdivision (b)(2).

As to the second aggravating circumstance, while defendant had certainly engaged in violent conduct as evidenced by the fact of his present and prior violent convictions, whether his conduct "indicate[d] a serious danger to society" (rule 4.421(b)(1)) was not a fact found true by the jury beyond a reasonable doubt or admitted by defendant. That circumstance was not proved in compliance with section 1170, subdivision (b).

As to the third aggravating circumstance, based on certified records of defendant's prior convictions (including the rap sheet), the trial court found true six prior felony convictions that supported its finding that defendant had suffered numerous prior convictions (the trial court did not find true defendant's 1992 petty theft with priors conviction); the trial court imposed a prior strike conviction modification to counts 1 and 4 and was not permitted to consider that conviction in imposing the upper term (rule 4.420(g); § 1170, subd. (b)(5)). (*People v. Searle* (1989) 213 Cal.App.3d 1091, 1098 [three prior convictions are numerous].) The third circumstance in aggravation was proved in compliance with section 1170, subdivision (b)(3).

As to the fourth aggravating circumstance, the jury did not find, and defendant did not admit, that he was on mandatory supervision and summary probation at the time of the offenses. While defendant's rap sheet tends to prove that defendant was on probation and mandatory supervision on the date he committed the charged offenses, section 1170, subdivision (b)(3) does not provide for the trial court to consider as an aggravating circumstance a defendant's probation or mandatory supervision status at the time of the charged offense without submitting the matter to a jury. Moreover, as the United States Supreme Court recently reiterated with respect to any fact that increases the penalty for a crime, "a judge may 'do no more, consistent with the Sixth Amendment, than determine

what crime, with what elements, the defendant was convicted of.' " (*Erlinger v. United States*, *supra*, 602 U.S. at p. 838.)

As to the fifth aggravating circumstance, defendant did not admit, and the jury did not find, that defendant's performance on probation, parole, and mandatory supervision had been unsatisfactory. Again, while defendant's rap sheet tended to prove that he suffered numerous violations of parole, those parole violations were not prior convictions appropriately considered consistent with the Sixth Amendment, or pursuant to section 1170, subdivision (b)(3), without submission to a jury.

Finally, as to the sixth aggravating circumstance, insofar as the trial court intended its final comment before imposing defendant's sentence as a further aggravating circumstance, defendant's certified rap sheet demonstrated he had previously suffered multiple prior convictions for crimes of which violence was an element[15] and the jury's verdicts necessarily concluded that defendant made at least three threats of violence in the present case. That aggravating circumstance was appropriately considered pursuant to section 1170, subdivision (b)(3).

In short, the first, third, and sixth aggravating circumstances were proved in compliance with section 1170, subdivision (b), but the second, fourth, and fifth circumstances were not. Unless the error was harmless, we must remand the matter to the trial court for resentencing.

---

[15] In addition to the prior felony convictions explicitly found true by the court in addressing the prior felony conviction allegations of the first amended information (§ 1203, subd. (e)(4)), which included battery to emergency personnel causing injury in 1997 (§ 243, subd. (c)), the rap sheet further reflected that defendant had been convicted of a misdemeanor assault offense in 1995 (§ 245, subd. (a)(1)), and misdemeanor infliction of corporal injury on an intimate partner in 2010 (§ 273.5, subd. (a)).

### C. Harmless Error

#### 1. Legal Standard

In *Lynch*, our Supreme Court held that where a trial court employed a former version of section 1170, subdivision (b), and relied on facts not proved in compliance with section 1170, subdivision (b) to impose the upper term, the sentence must be vacated and the matter remanded unless we conclude beyond a reasonable doubt that the jury would necessarily have found the facts underlying *all* circumstances in aggravation relied upon by the trial court true beyond a reasonable doubt. (*Lynch*, *supra*, 16 Cal.5th at pp. 742–743, 761.) "In making this determination, we may 'examine[] what the jury necessarily did find and ask[] whether it would be impossible, on the evidence, for the jury to find that without also finding the missing fact as well.' [Citation.] . . . We may also find the omission harmless if we can conclude beyond a reasonable doubt 'that the omitted [fact] was uncontested and supported by overwhelming evidence.' " (*Id.* at p. 775, italics omitted, brackets in original.) Further, because Senate Bill No. 567 "altered the scope of the trial court's discretion," for sentences imposed under the former version of section 1170, subdivision (b), "the record must clearly indicate that the court would have found an upper term justified had it been aware of its more limited discretion." (*Lynch*, at p. 743; see *id.* at p. 777 [providing examples of the "kind of definitive statements" that our Supreme Court has found to clearly indicate a trial court "would not impose a lesser sentence under any circumstances"].)

#### 2. Analysis

Returning to the aggravating circumstances relied upon by the trial court, we consider whether we can conclude beyond a reasonable doubt the second, fourth, and fifth circumstances—although not proved in compliance with section 1170, subdivision (b)—would *all* have been found true by the jury beyond a reasonable doubt. (*Lynch*, *supra*, 16 Cal.5th at pp. 742–743, 761.)

As to the second aggravating circumstance, while there can be no dispute that defendant had previously been convicted of violent offenses and in this case threatened to kill T.C. while attempting to beat down the door to J.S.'s home, we cannot conclude beyond a reasonable doubt that the jury would not have found true beyond a reasonable doubt that defendant's prior violent conduct presently "indicate[d] a *serious* danger to society." (Rule 4.421(b)(1), italics added.) Our Supreme Court has cautioned against attempting to determine whether a jury would have found true aggravating circumstances that require "an imprecise quantitative or comparative evaluation of the facts." (*People v. Sandoval* (2007) 41 Cal.4th 825, 840; accord, *Lynch*, *supra*, 16 Cal.5th at pp. 775–776.) "[T]o the extent a potential aggravating circumstance . . . rests on a somewhat vague or subjective standard, it may be difficult for a reviewing court to conclude with confidence that, had the issue been submitted to the jury, the jury would have assessed the facts in the same manner as did the trial court." (*Sandoval*, at p. 840.) Such is the case here. Whether defendant posed a serious danger to society is a somewhat subjective inquiry, not capable of precise determination. For instance, the jury might have concluded that because defendant was not armed with a weapon during the commission of the offenses, he did not pose a *serious danger* to society. Or it could have determined that he posed a serious risk of danger to society because of his repeated interactions with T.C. despite the protective order precluding him from such contact. Any conclusion on our part would be speculative.

As the parties agree, because we cannot conclude beyond a reasonable doubt that the jury would have found the second aggravating circumstance true beyond a reasonable doubt, we need not address the remaining aggravating circumstances relied upon by the trial court in imposing the upper term. Because we cannot find the omission of a jury finding harmless beyond a reasonable doubt as to the second aggravating circumstance,

defendant's sentence must be vacated and the matter remanded for full resentencing.[16] (*Lynch*, *supra*, 16 Cal.5th at p. 776.)  Moreover, we agree with defendant that the record provides no clear indication that the trial court would have imposed the upper term in light of the new presumptive middle term.  (*Id*. at p. 777.)

## DISPOSITION

Defendant's sentence is vacated and the matter is remanded for full resentencing in conformity with section 1170, subdivision (b).  The People may elect to retry the aggravating facts on remand.  In all other respects, the judgment is affirmed.

DETJEN, J.

I CONCUR:


HILL, P. J.

---

[16] " ' "The proper remedy for this type of failure of proof—where . . . [aggravating facts] were 'never tried' to the jury—is to remand and give the People an opportunity to retry" ' the aggravating facts."  (*Lynch*, *supra*, 16 Cal.5th at p. 776, brackets in original.)

MEEHAN, J., Concurring.

I concur in the majority's reasoning and affirmance of defendant's conviction on count 1 in part I. of the Discussion, and in affirmance of the trial court's denial of a continuance of the sentencing hearing in part II. of the Discussion. In part III. of the Discussion, I also fully concur with the majority's conclusion that this matter must be remanded for a full resentencing, but I reach that result on narrow grounds.

I agree the second aggravating circumstance was not proven in compliance with section 1170, subdivision (b), and violated defendant's Sixth Amendment jury-trial right. I concur that we cannot conclude the error was harmless pursuant to *People v. Lynch* (2024) 16 Cal.5th 730. As the majority points out, whether defendant's current and/or prior conduct poses a serious danger to society is a subjective inquiry that we cannot assess without resort to speculation about what a jury might determine. (*Id.* at pp. 775–776.) Finally, I also agree with the majority's observation the record provides no clear indication the trial court would have imposed the upper term in light of the new presumptive middle term maximum sentence. (*Lynch, supra*, at p. 777.)

As full resentencing is required for these reasons, I do not join the majority in determining whether any other facts supporting the aggravating circumstances were properly proven under state or federal law. At the time of resentencing, there is a possibility that additional evidence and arguments will be presented by the parties, there may be further relevant developments in the law, and we do not know what aggravating circumstances the trial court may ultimately consider or the factual bases supporting them. I would leave those circumstances for the trial court to consider in the first

instance based on the evidence and arguments presented, and the law in effect at the time of resentencing.[1]

MEEHAN, J.

---

[1] Having granted review in *People v. Wiley* (2023) 97 Cal.App.5th 676 (review granted Mar. 12, 2024, S283326), the California Supreme Court is poised to consider the scope of the prior conviction exception under federal and state law, and whether that exception encompasses facts beyond the bare fact of a prior conviction given recent developments in the law. (§ 1170, subd. (b)(3); *Erlinger v. United States* (2024) 602 U.S. 821.)